Shirlette L. BOWMAN, Rhoda M. Bowman, Mildred A. Bowman, Richard M. Bowman and Sandra L. Bowman, infants, by Richard M. Bowman, their father and next friend, and all others of the plaintiffs, Appellants,

v.

**COUNTY SCHOOL BOARD OF CHARLES CITY COUNTY, VIRGINIA et al., Appellees.**

No. 10793.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 9, 1967.

Decided June 12, 1967.

S. W. Tucker, Richmond, Va. (Henry L. Marsh, III, Willard H. Douglas, Jr., Richmond, Va., Jack Greenberg and James M. Nabrit, III, New York City, on brief) for appellants.

Frederick T. Gray, Richmond, Va. (Williams, Mullen & Christian, Richmond, Va., on brief) for appellees.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, J. SPENCER BELL,* WINTER and CRAVEN, Circuit Judges, sitting en banc.

HAYNSWORTH, Chief Judge:

In this school case, the Negro plaintiffs attack, as a deprivation of their constitutional rights, a "freedom of choice" plan, under which each Negro pupil has an acknowledged, "unrestricted right" to attend any school in the system he wishes. They contend that compulsive assignments to achieve a greater intermixture of the races, notwithstanding their individual choices, is their due. We cannot accept that contention, though a related point affecting the assignment of teachers is not without merit.

## I

"Freedom of choice" is a phrase of many connotations.

Employed as descriptive of a system of permissive transfers out of segregated schools in which the initial assignments are both involuntary and dictated by racial criteria, it is an illusion and an oppression which is constitutionally impermissible. Long since, this court has condemned it.[1] The burden of extracting individual pupils from discriminatory, racial assignments may not be cast upon the pupils or their parents. It is the duty of the school boards to eliminate the discrimination which inheres in such a system.

Employed as descriptive of a system in which each pupil, or his parents, must annually exercise an uninhibited choice, and the choices govern the assignments, it is a very different thing. If each pupil, each year, attends the school of his choice, the Constitution does not require that he be deprived of his choice unless its exercise is not free. This we have held,[2] and we adhere to our holdings.

Whether or not the choice is free may depend upon circumstances extraneous to the formal plan of the school board. If there is a contention that economic or other pressures in the community inhibit the free exercise of the choice, there must be a judicial appraisal of it, for "freedom of choice" is accept-

---

* Judge Bell sat as a member of the Court when the case was heard but died before it was decided.

1. Nesbit v. Statesville City Bd. of Educ., 4 Cir., 345 F.2d 333, 334 n. 3; Bradley v. School Bd. of Educ. of City of Richmond, 4 Cir., 345 F.2d 310, 319 & n. 18; Wheeler v. Durham City Bd. of Educ., 4 Cir., 309 F.2d 630, 633; Jeffers v. Whitley, 4 Cir., 309 F.2d 621; Marsh v. County School Bd. of Roanoke County, 4 Cir., 305 F.2d 94; Green v. School Bd. of City of Roanoke, 4 Cir., 304 F.2d 118; Hill v. School Bd. of City of Norfolk, 4 Cir., 282 F.2d 473; Jones v. School Bd. of City of Alexandria, 4 Cir., 278 F.2d 72.

2. Wheeler v. Durham City Bd. of Educ., 4 Cir., 346 F.2d 768, 773; Bradley v. School Bd. of Educ. of City of Richmond, 4 Cir., 345 F.2d 310, 313, vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187. See Jeffers v. Whitley, 4 Cir., 309 F.2d 621.

able only if the choice is free in the practical context of its exercise. If there are extraneous pressures which deprive the choice of its freedom, the school board may be required to adopt affirmative measures to counter them.

A panel of the Fifth Circuit[3] recently had occasion to concentrate its guns upon the sort of "freedom of choice" plan we have not tolerated, but, significantly, the decree it prescribed for its district courts requires the kind of "freedom of choice" plan we have held requisite and embodies standards no more exacting than those we have imposed and sanctioned.

■■ The fact that the Department of Health, Education and Welfare has approved the School Board's plan is not determinative. The actions of that department, as its guidelines, are entitled to respectful consideration, for, in large measure or entirely, they are a reflection of earlier judicial opinions. We reach our conclusion independently, for, while administrative interpretation may lend a persuasive gloss to a statute, the definition of constitutional standards controlling the actions of states and their subdivisions is peculiarly a judicial function.

■ Since the plaintiffs here concede that their annual choice is unrestricted and unencumbered, we find in its existence no denial of any constitutional right not to be subjected to racial discrimination.

## II

■ Appropriately, the School Board's plan included provisions for desegregation of the faculties. Supplemented at the direction of the District Court, those provisions are set forth in the margin.[4]

---

3. United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836, aff'd on rehearing en banc, 380 F.2d 385; see also, Deal v. Cincinnati Board of Education, 6 Cir., 369 F.2d 55.

4. The School Board of Charles City County recognizes its responsibility to employ, assign, promote and discharge teachers and other professional personnel of the school systems without regard to race, color or national origin. We further recognize our obligation to take all reasonable steps to eliminate existing racial segregation of faculty that has resulted from the past operation of a dual system based upon race or color.

In the recruitment, selection and assignment of staff, the chief obligation is to provide the best possible education for all children. The pattern of assignment of teachers and other staff members among the various schools of this system will not be such that only white teachers are sought for predominantly white schools and only Negro teachers are sought for predominantly Negro schools.

The following procedures will be followed to carry out the above stated policy:

1. The best person will be sought for each position without regard to race, and the Board will follow the policy of assigning new personnel in a manner that will work toward the desegregation of faculties.

2. Institutions, agencies, organizations, and individuals that refer teacher applicants to the school system will be informed of the above stated policy for faculty desegregation and will be asked to so inform persons seeking referrals.

3. The School Board will take affirmative steps including personal conferences with members of the present faculty to allow and encourage teachers presently employed to accept transfers to schools in which the majority of the faculty members are of a race different from that of the teacher to be transferred.

4. No new teacher will be hereafter employed who is not willing to accept assignment to a desegregated faculty or in a desegregated school.

5. All Workshops and in-service training programs are now and will continue to be conducted on a completely desegregated basis.

6. All members of the supervisory staff have been and will continue to be assigned to cover schools, grades, teachers and pupils with-

These the District Court found acceptable under our decision in Wheeler v. Durham City Board of Education, 4 Cir., 363 F.2d 738, but retained jurisdiction to entertain applications for further relief. It acted upon a record which showed that white teachers had been assigned to the "Indian school" and one Negro teacher had been assigned to a formerly all white school.

The appellants' complaint is that the plan is insufficiently specific in the absence of an immediate requirement of substantial interracial assignment of all teachers.

On this record, we are unable to say what impact such an order might have upon the school system or what administrative difficulties might be encountered in complying with it. Elimination of discrimination in the employment and assgnment of teachers and administrative employees can be no longer deferred,[5] but involuntary reassignment of teachers to achieve racial blending of faculties in each school is not a present requirement on the kind of record before us. Clearly, the District Court's retention of jurisdiction was for the purpose of swift judicial appraisal of the practical consequences of the School Board's plan and of the objective criteria by which its performance of its declared purposes could be measured.

An appeal having been taken, we lack the more current information which the District Court, upon application to it, could have commanded. Without such information, an order of remand, the inevitable result of this appeal, must be less explicit than the District Court's order, with the benefit of such information, might have been.

While the District Court's approval of the plan with its retention of jurisdiction may have been quite acceptable when entered, we think any subsequent order, in light of the appellants' complaints should incorporate some minimal, objective time table.

Quite recently, a panel of the Fifth Circuit Court of Appeals [6] has required some progress in faculty integration for the school year 1967–68. By that decree, school boards are required to take affirmative steps to accomplish substantial desegregation of faculties in as many of the schools as possible for the 1967–68 school year and, wherever possible, to assign more than one member of the minority race to each desegregated faculty. As much should be required here. Indeed, since there was an earlier start in this case, the District Court, with the benefit of current information, should find it appropriate to fashion an order which is much more specific and more comprehensive. What is done on remand, however, must be done upon a supplemented record after an appraisal of the practical, administrative and other

out regard to race, color or national origin.

7. It is recognized that it is more desirous, where possible, to have more than one teacher of the minority race (white or Negro) on a desegregated faculty.

8. All staff meetings and committee meetings that are called to plan, choose materials, and to improve the total educational process of the division are now and will continue to be conducted on a completely desegregated basis.

9. All custodial help, cafeteria workers, maintenance workers, bus mechanics and the like will continue to be employed without regard to race, color or national origin.

10. Arrangements will be made for teachers of one race to visit and observe a classroom consisting of a teacher and pupils of another race to promote acquaintance and understanding.

11. The School Board and superintendent will exercise their best efforts, individually and collectively, to explain this program to school patrons and other citizens of Charles City County and to solicit their support of it.

5. Bradley v. School Bd. of Educ. of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Wheeler v. Durham City Bd. of Educ., 4 Cir., 363 F.2d 738.

6. United States v. Jefferson County Bd. of Educ., fn. 3, supra.

problems, if any, remaining to be solved and overcome.

Remanded.

SOBELOFF, Circuit Judge, with whom WINTERS, Circuit Judge, joins, concurring specially.

Willingly, I join in the remand of the cases* to the District Court, for I concur in what this court orders. I disagree, however, with the limited scope of the remand, for I think that the District Court should be directed not only to incorporate an objective timetable in the School Boards' plans for faculty desegregation, but also to set up procedures for periodically evaluating the effectiveness of the Boards' "freedom of choice" plans in the elimination of other features of a segregated school system.

With all respect, I think that the opinion of the court is regrettably deficient in failing to spell out specific directions for the guidance of the District Court. The danger from an unspecific remand is that it may result in another round of unsatisfactory plans that will require yet another appeal and involve further loss of time. The bland discussion in the majority opinion must necessarily be pitched differently if the facts are squarely faced. As it is, the opinion omits almost entirely a factual recital. For an understanding of the stark inadequacy of the plans promulgated by the school authorities, it is necessary to explore the facts of the two cases.

*New Kent County.* Approximately 1,290 children attend the public schools of New Kent County. The system operated by the School Board consists of only two schools—the New Kent School, attended by all of the county's white pupils, and the Watkins School, attended by all of the county's Negro pupils.

There is no residential segregation and both races are diffused generally throughout the county. Yet eleven buses traverse the *entire* county to pick up the Negro students and carry them to the Watkins School, located in the western half of the county, and ten other buses traverse the *entire* county to pick up the white students for the New Kent School, located in the eastern half of the county. One additional bus takes the county's 18 Indian children to the "Indian" school, located in an adjoining county. Each of the county's two schools has 26 teachers and they offer identical programs of instruction.

Repeated petitions from Negro parents, requesting the adoption of a plan to eliminate racial discrimination, were totally ignored. Not until some months after the present action had been instituted on March 15, 1965, did the School Board adopt its "freedom of choice" plan.[1]

The above data relate to the 1964–1965 school year.[2] Since the Board's "freedom of choice" plan has now been in effect for *two* years as to grades 1, 2, 8, 9, 10, 11 and 12 and one year as to all other grades, clearly this court's remand should embrace an order requiring an evaluation of the success of the plan's operation over that time span, not only as to faculty but as to pupil integration as well. While the court does not order an inquiry in the District Court as to pupil integration, it of course does not

---

* This special concurrence is directed not only to Bowman v. County School Bd. of Charles City County, but also Green v. County School Bd. of New Kent County, 4 Cir., 382 F.2d 338, decided this day.

1. As this circuit has elsewhere said, "Such a last minute change of heart is suspect, to say the least." Cypress v. The Newport News General & Nonsectarian Hospital Ass'n, 375 F.2d 648, 658 (4th Cir. Mar. 9, 1967). See also Lankford v. Gelston, 364 F.2d 197, 203 (4th Cir. 1966). Of course, in the present case, the Dis-

trict Court has noted that the plan was adopted in order to comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1 (1964), and thus ensure the flow of federal funds.

2. These data are culled from answers to plaintiffs' interrogatories. Neither side has furnished us or the District Court with more recent data. In oral argument, the defendant replied obscurely and unspecifically to inquiries from the bench as to what progress the county had made.

forbid it. Since the District Judge retained the case on the docket, the matter will be open on remand to a thorough appraisal.

*Charles City County.* Approximately 1,800 children attend public schools in Charles City County. As in New Kent County, Negroes and whites live in the same neighborhoods and, similarly, segregated buses (Negro, Indian and white) traverse many of the same routes to pick up their respective charges.[3] The Board operates four schools in all—Ruthville, a combined elementary and high school exclusively for Negroes; Barnetts, a Negro elementary school; Charles City, a combined elementary and high school for whites; and Samaria, a combined elementary and high school for Indian children. Thus, as plaintiffs point out, the Board well into the second decade after the 1954 *Brown* decision, still maintains "what is in effect three distinct school systems—each organized along racial lines—with hardly enough pupils for one system!"[4] The District Court found that "the Negro elementary schools serve geographical areas. The other schools serve the entire county." This contrasting treatment of the races plainly exposes the prevailing discrimination. For the 1964–65 school year,

only eight Negro children were assigned to grades 4, 6, 7, 8, 9, 10 and 11 at the all-white Charles City School—an instance of the feeblest and most inconsequential tokenism.

Again, as in New Kent County, Negro parents on several occasions fruitlessly petitioned the School Board to adopt a desegregation plan. This suit was instituted on March 15, 1965 and the Board adopted the plan presently under consideration on August 6, 1965. Not until June 1966 did the Board assign a single Negro teacher to the all-white faculty at Charles City School. Apart from this faint gesture, however, the faculties of the Negro and white schools remain totally segregated.[5]

The majority opinion implies that this court has gone as far as the Fifth Circuit and that the "freedom of choice" plan which that circuit has directed its district courts to prescribe "embodies standards no more exacting than those we have imposed and sanctioned." If this court is willing to go as far as the Fifth Circuit has gone, I welcome the resolve.[6] It may be profitable, therefore, to examine closely what the Court of Appeals of that jurisdiction has recently said and done.[7] We may then see how much further our court needs to go

3. The Eighth Circuit has recently held that the operation of two school buses, one for Negro children and one for white, along the same route, is impermissible. "While we have no authority to strike down transportation systems because they are costly and inefficient, we must strike them down if their operation serves to discourage the desegregation of the school systems." Kelley v. Altheimer, Arkansas Public School District, 378 F.2d 483 (8th Cir. Apr. 12, 1967).

4. The Board seems to go to an extreme of inefficiency and expense in order to maintain the segregated character of its schools, indulging in the luxury of three separate high school departments to serve a total of approximately 600 pupils, 437 of whom are in one school, and three separate and overlapping bus services.

5. Three of the Board's eight teachers in the 175 pupil "Indian" school are white, the other five are Indian.

The Board asserts that it is "earnestly" seeking white teachers for the nine existing vacancies in the Negro schools, but so far its efforts have not met with success. This is not surprising, considering that the Board has formally declared that it "does not propose to advertise vacancies in papers as this would likely cause people of both races to apply who are not qualified to teach."

6. A recent article in the Virginia Law Review declares the Fifth Circuit to be "at once the most prolific and the most progressive court in the nation on the subject of school desegregation." Dunn, Title VI, the Guidelines and School Desegregation in the South, 53 VA.L.REV. 42, 73 (1967).

7. United States v. Jefferson County Bd. of Educ., 372 F.2d 836 (5th Cir. 1966), aff'd on rehearing en banc, 380 F.2d 385 (5th Cir., Mar. 29, 1967).

to bring itself abreast of the Fifth Circuit.

## I. *Pupils*

Under the plans of both Charles City County and New Kent County, only children entering grades one *or* eight are *required* to express a choice. Freedom of choice is *permitted* children in all other grades, and "any pupil in grades other than grades 1 and 8 for whom a choice of school is not obtained *will be assigned to the school he is now attending.*"

In sharp contrast, the Fifth Circuit has expressly abolished "permissive" freedom of choice and ordered *mandatory* annual free choice for *all* grades, and "[a]ny student who has not exercised his choice of school within a week after school opens *shall be assigned to the school nearest his home* * * *." [8] This is all that plaintiffs have been vainly seeking in New Kent County—that students be assigned to the schools nearest their homes.

If, in our cases, those who failed to exercise a choice were to be assigned to the schools nearest their homes, as the Fifth Circuit plan provides, instead of to the schools they previously attended, as directed in the plans before us, there would be a measure of progress in overcoming discrimination. As it is, the plans manifestly perpetuate discrimination. In view of the situation found in New Kent County, where there is no residential segregation, the elimination of the dual school system and the establishment of a "unitary, non-racial system" could be readily achieved with a minimum of administrative difficulty by means of geographic zoning—simply by assigning students living in the eastern half of the county to the New Kent School and those living in the western half of the county to the Watkins School. Although a geographical formula is not universally appropriate, it is evident that here the Board, by separately busing Negro children across the entire county to the "Negro" school, and the white children to the "white" school, is deliberately maintaining a segregated system which would vanish with non-racial geographic zoning. The conditions in this county present a classical case for this expedient.

In Charles City County, *Negro* elementary school children are geographically zoned, while *white* elementary school children are not, despite the conceded fact that the children of both races live in all sections of the county. Surely this curious arrangement is continued to prop up and preserve the dual school system proscribed by the Constitution and interdicted by the Fifth Circuit:

"The Court holds that boards and officials administering public schools in this circuit have the affirmitive duty under the Fourteenth Amendment to bring about an *integrated, unitary* school system in which there are no Negro schools and no white schools— just schools. * * * In fulfilling this duty it is not enough for school authorities to offer Negro children the opportunity to attend formerly all-white schools. The necessity of overcoming the effects of the *dual school system* in this circuit requires integration of faculties, facilities, and activities, as well as students." [9]

The Fifth Circuit stresses that the goal is "a unitary, non-racial system" and the question is whether a free choice plan will materially further the attainment of this goal. Stating that courts must continually check the sufficiency of school boards' progress toward the goal, the Fifth Circuit decree requires school authorities to report regularly to the district courts to enable them to evaluate compliance "by measuring the performance." In fashioning its decree, that circuit gave great weight to the percentages referred to in the HEW Guide-

---

8. United States v. Jefferson County Bd. of Educ., 380 F.2d 385, 391 (5th Cir., Mar. 29, 1967) (en banc). (Emphasis supplied.)

9. 380 F.2d at 389 (en banc). (Emphasis supplied.)

lines,[10] declaring that they establish "minimum" standards

"for measuring the effectiveness of freedom of choice as a useful tool. \* \* \* If the plan is ineffective, longer on promises than performance, the school officials charged with initiating and administering a unitary system have not met the constitutional requirements of the Fourteenth Amendment; *they should try other tools.*"[11]

"Freedom of choice" is not a sacred talisman; it is only a means to a constitutionally required end—the abolition of the system of segregation and its effects.[12] If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end. The school officials have the continuing duty to take whatever action may be necessary to create a "unitary, non-racial system."

While I would prefer it if this court were more explicit in establishing requirements for periodic reporting by the school officials, I assume that the District Court will do this, rather than place the burden upon the plaintiffs to collect the essential data to show whether the free choice plan is materially furthering the achievement of "a unitary, non-racial system." [13]

A significant aspect of the Fifth Circuit's recent decree that, by implication, this court has adopted, deserves explicit

10. "[S]trong policy considerations support our holding that the standards of court-supervised desegregation should not be lower than the standards of HEW-supervised desegregation. The Guidelines, of course, cannot bind the courts; we are not abdicating any judicial responsibilities. [Footnote omitted.] But we hold that HEW's standards are substantially the same as this Court's standards. They are required by the Constitution and, as we construe them, are within the scope of the Civil Rights Act of 1964. In evaluating desegregation plans, district courts should make few exceptions to the Guidelines and should carefully tailor those so as not to defeat the policies of HEW or the holding of this Court."

United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 848 (5th Cir., Dec. 29, 1966), adopted en banc, 380 F.2d 385 (5th Cir., Mar. 29, 1967). Cf. Cypress v. Newport News Gen. Hosp., 375 F.2d 648, n. 15 (4th Cir., Mar. 9, 1967).

11. 380 F.2d at 390 (Emphasis supplied.) The HEW Guidelines provide: (1) if 8 or 9 percent of the Negro students in a school district transferred from segregated schools during the first year of the plan, the total transfers the following year must be on the order of at least *twice* that percentage; (2) if only 4 or 5 percent transferred, a "substantial" increase in the transfers will be expected the following year—bringing the total to at least *triple* the percentage of the previous year; (3) if less than 4 percent transferred the previous year, then the rate of increase in total transfers for the following year must be proportionately greater than that under (2); and (4) if no students transferred under a free choice plan, then unless a very "substantial start" is made in the following year, the school authorities will "be required to adopt a different type of plan." HEW Reg. A., 45 C.F.R. § 181.54 (Supp.1966).

In both New Kent County and Charles City County, at least some grades have operated under a "freedom of choice" plan for two years. In Charles City County, only 0.6% of the Negro students transferred to the white school for the 1964–65 session. Under the standards subscribed to by the Fifth Circuit, therefore, a minimum of 6% of the Negro pupils in that county should have transferred to the "white" school the following year. Less than this percentage would indicate that the free choice plan was "ineffective, longer on promises than performance," and that the school officials "should try other tools"—e. g., geographic zoning or pairing of grades.

In New Kent County, no Negro students transferred during the first year of the plan. Thus, unless the requisite "substantial start" was made the following year, school officials *must* adopt a different plan—one that will work.

12. Judge Wisdom, in Singleton v. Jackson Munic. Separate School Dist., 355 F. 2d 865, 871 (5th Cir. 1966), referred to "freedom of choice" plans as a "haphazard basis" for the administration of schools.

13. See Section IX of the decree issued in United States v. Jefferson County Bd. of Educ., 380 F.2d 385, 395 (5th Cir. Mar. 29, 1967) (en banc) providing for detailed reports to the district courts.

recognition. The *Jefferson County* decree orders school officials, "without delay," to take appropriate measures for the protection of Negro students who exercise a choice from "harassment, intimidation, threats, hostile words or acts, and similar behavior." Counsel for the school boards assured us in oral argument that relations between the races are good in these counties, and that no incidents would occur. Nevertheless, the *fear* of incidents may well intimidate Negroes who might otherwise elect to attend a "white" school.[14] To minimize this fear, school officials must demonstrate unequivocally that protection will be provided. It is the duty of the school boards actively to oversee the process, to publicize its policy in all segments of the population and to enlist the cooperation of police and other community agencies.[15]

The plaintiffs vigorously assert that the adoption of the Board's free choice plan in Charles City County, without further action toward equalization of facilities, will not cure present gross inequities characterizing the dual school system. A glaring example is the assignment of 135 commercial students to one teacher in the Negro school in contrast to the assignment of 45 commercial students per teacher in the white school and 36 in the Indian school. In the *Jefferson County* decree, the Fifth Circuit directs its attention to such matters and explicitly orders school *officials* to take "prompt steps" to correct such inequalities. School authorities, who hold responsibility for administration, are not allowed to sit back complacently and expect unorganized pupils or parents to effect a cure for these shockingly discriminatory conditions. The decree provides:

"Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios shall, to the extent feasible, be *distributed evenly* between schools formerly maintained for Negro students and those formerly maintained for white students. If for any reason it is not feasible to improve sufficiently any school formerly maintained for Negro students, * * * such school shall be *closed* as soon as possible, and students enrolled in the

---

14. Various factors, some subtle and some not so subtle, operate effectively to maintain the status quo and keep Negro children in "their" schools. Some of these factors are listed in the recent report issued by the U. S. Commission on Civil Rights:

"Freedom of choice plans accepted by the Office of Education have not disestablished the dual and racially segregated school systems involved, for the following reasons: a. Negro and white schools have tended to retain their racial identity; b. White students rarely elect to attend Negro schools; c. Some Negro students are reluctant to sever normal school ties, made stronger by the racial identification of their schools; d. Many Negro children and parents in Southern States, having lived for decades in positions of subservience, are reluctant to assert their rights; e. Negro children and parents in Southern States frequently will not choose a formerly all-white school because they fear retaliation and hostility from the white community; f. In some school districts in the South, school officials have failed to prevent or punish harassment by white children who have elected to attend white schools; g. In some areas in the South where Negroes have elected to attend formerly all-white schools, the Negro community has been subjected to retaliatory violence, evictions, loss of jobs, and other forms of intimidation."

U. S. COMM'N ON CIVIL RIGHTS, SURVEY OF SCHOOL DESEGREGATION IN THE SOUTHERN AND BORDER STATES—1965–66, at 51 (1966). In addition to the above enumeration, a report of the Office of Education has pointed out that Negro children in the high school grades refrain from choosing to transfer because of reluctance to assume additional risks close to graduation. Coleman & Campbell, Equality of Educational Opportunity (U.S. Office of Education, 1966). See also Hearings Before the Special Subcommittee on Civil Rights of the House Committee on the Judiciary, 89th Cong., 2d Sess., ser. 23 (1966).

15. HEW Reg. A, 45 C.F.R. § 181.17(c) (Supp.1966).

school shall be reassigned on the basis of freedom of choice." [16]

## II. *Faculty*

Defendants unabashedly argue that they cannot be compelled to take any affirmative action in reassigning teachers, despite the fact that teachers are hired to teach in the *system,* not in a particular school. They assert categorically that "they are not required under the Constitution to desegregate the faculty." This is in the teeth of Bradley v. School Bd. of Educ. of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965).

Having made this declaration, they say that they have nevertheless submitted a plan which does provide for faculty desegregation, but circumspectly they add that "it will require time and patience." They protest that they have done all that could possibly be demanded of them by providing a plan which would permit "a constructive beginning." This argument lacks appeal an eighth of a century after *Brown.*[17] Children too young for the first grade at the time of that decision are beyond high school age by now. Yet their entire school experience, like that of their elder brothers and sisters, parents and grandparents, has been one of total segregation. They have attended only a "Negro" school with an all Negro staff and an all Negro student body. If their studies encompassed Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 they must surely have concluded sadly that "the law of the land" is singularly ineffective as to them.

The plans of both counties grandly profess that the pattern of staff assignment "will not be such that only white teachers are sought for predominantly white schools and only Negro teachers are sought for predominantly Negro schools." No specific steps are set out, however, by which the boards mean to integrate faculties. It cannot escape notice that the plans provide only for assignments of *"new* personnel in a manner that will *work towards* the desegregation of faculties." As for teachers presently employed by the systems, they will be "allowed" (in Charles City County, the plan reads "allowed and encouraged") to accept transfers to schools in which the majority of the faculty members are of the opposite race. We are told that heretofore an average of only 2.6 new white teachers have been employed annually in New Kent County. Thus the plan would lead to desegregation only by slow attrition. There is no excuse for thus protracting the corrective process. School authorities may not abdicate their plain duty in this fashion. The plans filed in these cases leave it to the *teachers,* rather than the Board, to "disestablish dual, racially segregated school systems" and to establish "a unitary, non-racial system." This the law does not permit.

As the Fifth Circuit has put it, "school authorities have an *affirmative duty* to break up the historical pattern of segregated faculties, the hallmark of the dual system." [18]

"[U]ntil school authorities recognize and carry out their affirmative duty to integrate faculties as well as facilities, there is not the slightest possibility of their ever establishing an operative non-discriminatory school system." [19]

---

16. 380 F.2d at 393 (en banc). (Emphasis supplied.)

17. "The rule has become: the later the start the shorter the time allowed for transition." Lockett v. Bd. of Educ. of Muscogee County, 342 F.2d 225, 228 (5th Cir. 1965). See Rogers v. Paul, 382 U.S. 198, 199, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Bd. of Educ. of City of Richmond, 382 U.S. 103, 86 S.Ct. 224 (1965); Griffin v. County

School Bd., 377 U.S. 218, 229, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Watson v. City of Memphis, 373 U.S. 526, 530, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963).

18. 372 F.2d at 895.

19. United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 892 (5th Cir. 1966), adopted en banc, 380 F.2d 385 (5th Cir. Mar. 29, 1967).

This thought has been similarly expressed in Bradley v. School Bd. of Educ.

In contrast to the frail and irresolute plans submitted by the appellees, the Fifth Circuit has ordered school officials within its jurisdiction not only to make *initial* assignments on a non-discriminatory basis, but also to *reassign* staff members "to eliminate 'past discriminatory patterns.'"

For this reason, I wholeheartedly endorse the majority's remand for the inclusion of an *objective* timetable to facilitate evaluation of the progress of school authorities in desegregating their faculties. I also join the majority in calling upon the District Court to fashion a specific and comprehensive order requiring the boards to take firm steps to achieve *substantial* desegregation of the faculties. At this late date a desegregation plan containing only an indefinite pious statement of future good intentions does not merit judicial approval.

I must disagree with the prevailing opinion, however, where it states that the record is insufficiently developed to order the school systems to take further steps at this stage. No legally acceptable justification appears, or is even faintly intimated, for not immediately integrating the faculties. The court underestimates the clarity and force of the facts in the present record, particularly with respect to New Kent County, where there are only two schools, with identical programs of instruction, and each with a staff of 26 teachers. The situation presented in the records before us is so patently wrong that it cries out for immediate remedial action, not an inquest to discover what is obvious and undisputed.

It is time for this circuit to speak plainly to its district courts and tell them to require the school boards to get on with their task—no longer avoidable or deferrable—to integrate their faculties. In Kier v. County School Bd. of Augusta County, 249 F.Supp. 239, 247 (W.D.Va. 1966), Judge Michie, in ordering complete desegregation by the following years of the staffs of the schools in question, required that "the percentage of Negro teachers in each school in the system should approximate the percentage of the Negro teachers in the entire system" for the previous year. See Dowell v. School Bd. of Oklahoma City, 244 F.Supp. 971, 977, 978 (W.D.Okl. 1965), aff'd 375 F.2d 158 (10th Cir., Jan. 23, 1967), cert. denied, 387 U.S. ——, 87 S.Ct. 2054, 18 L.Ed.2d 993 (U.S. May 29, 1967). While this may not be the precise formula appropriate for the present cases, it does indicate the attitude that district courts may be expected to take if this court speaks with clarity and firmness.

### III. *The Briggs v. Elliott Dictum*

The defendants persist in their view that it is constitutionally permissible for *parents* to make a choice and assign their children; that courts have no role to play where segregation is not actively *enforced*. They say that *Brown* only proscribes enforced segregation, and does not command action to undo existing consequences of earlier enforced segregation, repeating the facile formula of Briggs v. Elliott.[20]

The court's opinion recognizes that "it is the duty of the school boards to eliminate the discrimination which inheres" in a system of segregated schools where the "initial assignments are both involuntary and dictated by racial criteria," but seems to think the system under consideration today "a very different

---

of City of Richmond, 345 F.2d 310, 323 (4th Cir. 1965) (concurring opinion): "It is now 1965 and high time for the court to insist that good faith compliance requires administrators of schools to proceed actively with *their* nontransferable duty to undo the segregation which both by action and inaction has been persistently perpetuated." (Emphasis in the original.)

20. "Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination." 132 F.Supp. 776, 777 (E.D.S.C. 1955).

thing." I fail to perceive any basis for a distinction. Certainly the two counties with which we are here concerned, like the rest of Virginia, historically had *de jure* segregation of public education, so that by the court's own definition, the boards are under a duty "to eliminate the discrimination which inheres" in such a system. Whether or not the schools now permit "freedom of choice," the segregated conditions initially created *by law* are still perpetuated by relying primarily on Negro pupils "to extricate themselves from the segregation which has long been firmly established and resolutely maintained * * *."[21] "[T]hose who operate the schools formerly segregated by law, and not those who attend, are responsible for school desegregation."[22]

It is worth recalling the circumstances that gave birth to the Briggs v. Elliott dictum—it is no more than dictum. A three-judge district court over which Judge Parker presided had denied relief to South Carolina Negro pupils and when this decision came before the Supreme Court as part of the group of cases reviewed in Brown v. Bd. of Educ., the Court overruled the three-judge court and issued its mandate to admit the complaining pupils to public schools "on a racially nondiscriminatory basis with all deliberate speed." Reassembling the three-judge panel, Judge Parker undertook to put his gloss upon the Supreme Court's decision and coined the famous saying.[23] This catchy apothegm immediately became the refuge of defenders of the segregation system, and it has been quoted uncritically to eviscerate the Supreme Court's mandate.[24]

Having a deep respect for Judge Parker's capacity to discern the lessons of experience and his high fidelity to duty and judicial discipline, it is unnecessary

---

21. Bradley v. School Bd. of City of Richmond, 345 F.2d 310, 322 (4th Cir. 1965) (concurring opinion).

22. Dunn, Title VI, the Guidelines and School Desegregation in the South, 53 VA.L.REV. 42, 45 (1967).
   See Dowell v. School Bd. of Oklahoma City, 244 F.Supp. 971, 975, 981 (W.D. Okl.1965), aff'd 375 F.2d 158 (10th Cir. Jan. 23, 1967), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (U.S. May 29, 1967):
   "The Board maintains that it has no affirmative duty to adopt policies that would increase the percentage of pupils who are obtaining a desegregated education. But a school system does not remain static, and *the failure to adopt an affirmative policy is itself a policy*, adherence to which, at least in this case, has slowed up—in some cases— reversed the desegregation process.
   * * * * *
   The duty to disestablish segregation is clear in situations such as Oklahoma City, where such school segregation policies were in force and their effects have not been corrected." (Emphasis supplied.)

23. See n. 20, supra.

24. Judge Wisdom, in the course of a penetrating criticism of the *Briggs* decision, says:
   "*Briggs* overlooks the fact that Negroes collectively are harmed when the state, by law or custom, operates segregated schools *or a school system with uncorrected effects of segregation.*
   * * * * *
   Adequate redress therefore calls for much more than allowing a few Negro children to attend formerly white schools; it calls for liquidation of the state's system of de jure school segregation and *the organized undoing of the effects of past segregation.*
   * * * * *
   The central vice in a formerly de jure segregated public school system is apartheid by dual zoning * * *. Dual zoning persists in the continuing operation of Negro schools identified as Negro, historically and because the faculty and students are Negroes. Acceptance of an individual's application for transfer, therefore, may satisfy that particular individual; it will not satisfy the class. The class is all Negro children in a school district attending, by definition, inherently unequal schools and wearing the badge of slavery separation displays. Relief to the class requires school boards to desegregate *the school from which a transferee comes* as well as the school to which he goes.
   * * * [T]he overriding right of Negroes as a class [is] to a *completely integrated* public education."
   372 F.2d at 866. (Emphasis supplied.)

for me to speculate how long he would have adhered to his view, or when he would have abandoned the dictum as unworkable and inherently contradictory.[25] In any event, the dictum cannot withstand the authority of the Supreme Court or survive its exposition of the spirit of the *Brown* holding, as elaborated in Bradley v. School Bd., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Goss v. Bd. of Educ., 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).

Anything that some courts may have said in discussing the obligation of school officials to overcome the effects of *de facto* residential segregation, caused by private acts and not imposed by law, is certainly not applicable here. Ours is the only circuit dealing with school segregation resulting from past legal compulsion that still adheres to the *Briggs* dictum.

> "The Fourth is apparently the only circuit of the three that continues to cling to the doctrine of Briggs v. Elliott and embraces freedom of choice as a final answer to school desegregation in the absence of intimidation and harassment." [26]

We should move out from under the incubus of the Briggs v. Elliott dictum and take our stand beside the Fifth and the Eighth Circuits.

25. Shortly after pronouncing his dictum, in another school case Judge Parker nevertheless recognized that children cannot enroll themselves and that the duty of enrolling them and operating schools in accordance with law rests upon the officials and cannot be shifted to the pupils or their parents. Carson v. Warlick, 4 Cir., 238 F.2d 724, 728 (1956).

26. Dunn, Title VI, the Guidelines and School Desegregation in the South, 53 VA.L.REV. 42, 72 (1967). See United States v. Jefferson County Bd. of Educ., 380 F.2d 385 (5th Cir., Mar. 29, 1967) (en banc); Singleton v. Jackson Munic. Separate School Dist., 348 U.S. 729, 730 n. 5 (5th Cir. 1965) ("[T]he second Brown opinion clearly imposes on public school authorities the duty to provide an integrated school system. Judge Park-

er's well known dictum * * * in Briggs v. Elliott * * * should be laid to rest. It is inconsistent with Brown and the later development of decisional and statutory law in the area of civil rights."); Kemp v. Beasley, 352 F.2d 14, 21 (8th Cir. 1965) ("The dictum in Briggs has not been followed or adopted by this Circuit and it is logically inconsistent with Brown and subsequent decisional law on this subject.")

Cf. Evans v. Ennis, 281 F.2d 385, 389 (3d Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961): "[T]he Supreme Court has unqualifiedly declared *integration* to be their constitutional right." (Emphasis supplied.)

