394 F.2d 410
 Howard Douglas COPPEDGE, a minor, by his Father and Next Friend, Rev. Luther Coppedge, et al., Plaintiffs, and United States of America, by Ramsey Clark, Attorney General, Plaintiff-Intervenor, Appellees,
v.
The FRANKLIN COUNTY BOARD OF EDUCATION, a public body corporate, Warren W. Smith, Superintendent, Mrs. T. H. Dickens, Chairman, Jones H. Winston, Albert C. Fuller, Lloyd A. West, Horace W. Baker, members of the Franklin County Board of Education, Appellants.
 No. 11794.
 United States Court of Appeals Fourth Circuit.
 Argued February 5, 1968.
 Decided April 8, 1968.
 As Corrected on Denial of Rehearing May 31, 1968.
 
 Edward F. Yarborough, Louisburg, N. C., and Irvin B. Tucker, Jr., Raleigh, N. C. (Charles M. Davis and W. M. Jolly, Louisburg, N. C., on brief), for appellants.
 J. LeVonne Chambers, Charlotte, N. C. (Jack Greenberg, James M. Nabrit, III, Robert Belton, James N. Finney, New York City, and Conrad O. Pearson, Durham, N. C., on brief), for plaintiffs-appellees.
 Frank E. Schwelb, Atty., Dept. of Justice (Stephen J. Pollak, Asst. Atty. Gen., and Francis H. Kennedy, Atty., Dept. of Justice, on brief), for plaintiff-intervenor.
 Linwood T. Peoples, Henderson, N. C., for amici curiae.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges, sitting en banc.
 HAYNSWORTH, Chief Judge:
 
 
 1
 The School Board of a county in which there has been much Ku Klux Klan activity appeals from an order requiring it to abandon its freedom of choice plan and to adopt a new plan for pupil assignments based upon a unitary system of geographic attendance zones or upon the consolidation of grades or schools or both. Since it clearly appears that the School Board did nothing to relieve the pressures inhibiting the free exercise of the right of choice, the District Judge properly required the Board to turn to other measures.
 
 
 2
 The School Board of Franklin County, North Carolina took no steps to desegregate its schools until 1965. It then adopted a freedom of choice plan. There followed, however, numerous acts of violence and threats directed against Negro members of the community, particularly those requesting transfers of their children into formerly all-white schools. Shots were fired into houses, oil was poured into wells and some of the Negro leaders were subjected to a barrage of threatening telephone calls. The violence was widely reported in the local press, and an implicit threat was carried home to everyone by publication of the names of Negro applicants for transfer.
 
 
 3
 The School Board did nothing to counter or alleviate these conditions. It took the position that it was not responsible for the threats and acts of violence, but it did not recognize its responsibility to assure true freedom in the exercise of the right of choice or to adopt some other plan for the assignment of pupils which would relieve them from extraneous pressures. When ordered by the District Court in 1966 to encourage faculty transfers to desegregate faculties, it contented itself with the circulation of a staff memorandum, quoting that portion of the Court's order. Thereafter it did assign two Negro librarians to two white schools and a white librarian and a part-time English teacher to one all-Negro school, but that was insubstantial progress in those three schools and the faculties of the remaining nine schools continued to be entirely segregated. In the most charitable view, the School Board's response to the Court's order to encourage faculty transfers across racial lines was wooden and little calculated to procure the result the Court envisioned.
 
 
 4
 The School Board took no other steps to alleviate the threatening conditions. It offered no special protection. It gave no assurances. It did nothing.
 
 
 5
 Under the circumstances, it is not surprising that few Negro pupils availed themselves of the right of transfer into a formerly all-white school and that 98.5% of the Negro pupils in the district remained in all-Negro schools.
 
 
 6
 Faced with these circumstances in the summer of 1967, the Court ordered the School Board to transfer to formerly all-white schools a sufficient number of Negro pupils to bring the Negro enrollment in formerly all-white schools up to 10% of the total Negro pupil population.[1] For the 1968-69 school year, the Court ordered the School Board to adopt and submit a plan of involuntary assignments based upon geographic attendance zones or upon the consolidation of grades or schools or both. The latter suggestion was born of the apparent fact that throughout the school district white and Negro schools are paired in relatively close proximity to each other.
 
 
 7
 It is that order in its application to the school year 1968-1969 that the School Board contests, contending that it was entitled to maintain its freedom of choice plan, notwithstanding its inaction in its support.
 
 
 8
 Fifty-five of the Negro pupils involuntarily transferred for the 1967-1968 school year to formerly all-white schools obtained a lawyer and sought intervention in this Court in support of a freedom of choice plan. They want the right to remain in the familiar surroundings of all-Negro schools.[2]
 
 
 9
 In Bowman v. County School Board of Charles City County, 4 Cir., 382 F.2d 326, we took pains to point out that freedom of choice is an acceptable plan for the desegregation of a public school system only if the choice is free in the practical context of its exercise. The record here abundantly supports the district court's finding that the choice has not been free in the practical context of its exercise in Franklin County, North Carolina. The deliberate acts of violence and despoiliation and the repeated threats and harassments were clearly calculated to have an inhibiting effect upon the entire Negro population, an effect that was clearly enhanced by the wide publicity given to it and made extremely pointed by the publication of the names of transfer applicants and their parents. Since the School Board had done nothing to remedy the situation, to insure freedom in the exercise of the right of choice or to modify its assignment plan, the District Court was plainly right in requiring the School Board to turn to something else. Indeed, it would have been very derelict in its duty had it permitted the School Board to proceed on in its indifferent way after its less than half-hearted compliance with its faculty desegregation order and the abundant evidence that the intimidating activity had indeed had a chilling effect on the Negro residents of the district.
 
 
 10
 As to the applicants for intervention, if a real and practical freedom of choice cannot be extended to those Negroes who wish to go to formerly all-white schools, it cannot be extended to those who have different preferences.
 
 
 11
 On the record made before it in the summer of 1967, the Court quite naturally and properly concluded that the situation called for drastic measures and that no pupil choice should have any place in it.
 
 
 12
 We conclude that the Court's order was well within the range of the discretion vested in it.
 
 
 13
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 We do not pause to consider the propriety of that interim measure under the Civil Rights Act of 1964, particularly 42 U.S. C.A. §§ 2000c(b) and 2000c6(a). A substantial part of the school year is now over and no one, not even the protesting Negro transferees, request reassignment at this time of the year
 
 
 [2]
 The petition to intervene was not allowed, but they were heard as amicus curiae in support of reversal. Our refusal to allow formal intervention in this Court is, of course, without prejudice to any application they may subsequently file for intervention in the District Court
 
 
 
 14
 ALBERT V. BRYAN, Circuit Judge (concurring specially):
 
 
 15
 While I am concurring in the majority opinion, I do not want my assent to be construed as approving these portions of the District Court's decree:
 
 
 16
 (1) The transfer of pupils with an eye to a racial balancing of students in any school. In my reading the 1964 Civil Rights Act, 42 USC 2000c and 2000c-6 (a), forbids "any order [of a Federal court] seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another".
 
 
 17
 (2) The restriction upon the newspaper publication of the names of the transferring pupils, for it violates the First Amendment. This is official public information, and no matter the motive of the publisher, it cannot be suppressed.
 
 
 18
 The task of the District Judge was not enviable, and he acted conscientiously to meet the outrageous and cowardly acts of the criminal element. As the present school session expires in a few weeks, and the points I now make may thereafter become moot, I join in the Court's opinion.