UNITED STATES of America, by Ramsey CLARK, Attorney General, Plaintiff,

v.

BERTIE COUNTY BOARD OF EDUCATION et al., Defendants.

Civ. No. 632.

United States District Court
E. D. North Carolina,
Washington Division.

Aug. 5, 1968.

As Amended Aug. 9, 1968.

Robert H. Cowen, U. S. Atty., Eastern District of North Carolina, Raleigh, N. C., Frank E. Schwelb and Francis H. Kennedy, Jr., Attys., Dept. of Justice, for plaintiff.

Rodman & Rodman by Edward N. Rodman, Washington, N. C., and Pritchett, Cooke & Burch, by William L. Cooke, Windsor, N. C., for defendants.

## OPINION AND ORDER

LARKINS, District Judge:

### SUMMARY

This school desegregation suit was instituted by the United States by the filing of a complaint on June 16, 1967, pursuant to Sections 407(a) and (b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6(a) and (b), alleging the operation by the defendants of a system of dual schools based on race. The complaint prayed for injunctive relief. The Court, on July 28, 1967, denied defendants' motion to make the complaint more definite and thereafter, on August 14, 1967, the defendants entered a general denial to the substance of the complaint and in addition made motions to dismiss, for summary judgment, for judgment on the pleading, and for a jury trial. Plaintiff filed a motion for a preliminary injunction on August 14, 1967, alleging that schools were racially identifiable by the composition of faculty assignments, in that all of the approximately 100 white principals and teachers were assigned to predominantly white schools, and approximately 165 Negro principals and teachers were assigned to Negro schools, except for four Negro teachers assigned to one predominantly white school. The motion prayed for an order requiring defendants to assign no fewer than two teachers of the minority race to each school for the 1967–68 year.

The matter was tried to the Court on the pleadings, exhibits, and depositions of witnesses, and having heard the arguments of counsel for the parties, and having considered all the foregoing, the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, hereby makes the following:

### FINDINGS OF FACT

A. History of School Desegregation in Bertie County

1. Prior to the 1965–1966 school year, the Bertie County school system was completely segregated by race, except that in 1964–1965, one Negro student attended an otherwise all-white school. All white pupils attended schools staffed exclusively by white teachers and administrators. All Negro pupils (except for the one student previously mentioned) attended schools staffed exclusively by Negro teachers and administrators.

2. For the 1966–1967 school year, 310 or 6.7% of the approximately 4,638 Negro students chose and attended predominantly white schools under the freedom of choice plan.

3. For the 1967–1968 school year, 439 or 9.1% of the approximately 4,824 Negro students were assigned to predominantly white schools. The remaining 4,385 or 90.9% of the Negro students attended Negro schools.

4. In the spring of 1968, defendants administered a new freedom of choice period for the 1968–1969 school year; 323 Negro students elected to attend pre-

dominantly white schools. No white students chose to attend the all-Negro schools. The defendants also propose to assign an additional 134 Negro pupils to predominantly white schools. If the defendants' plan is approved, a total of 457, or approximately 9% of the 5,117 Negro students, will attend previously white schools. Defendants propose that the remaining 91% of the Negro pupils and all of the white pupils will continue to attend schools traditionally maintained for their race.

5. No white student has ever attended a traditionally Negro school in Bertie County. Defendants' plan makes no provision and holds out no promise for desegregating the Negro schools.

6. The defendant Board of Education has come forth with no plans for additional student desegregation, even though what defendants propose for student desegregation is substantially less than the amount of progress made in New Kent County and disapproved by the Supreme Court in Green v. County School Board of New Kent County, Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (May 27, 1968).

7. Schools of this system still remain, under defendants' present "freedom of choice" plan including proposed involuntary assignments of Negro students to predominantly white schools, clearly identifiable as being intended for students of a particular race. The "freedom of choice" plan in Bertie County has not operated to bring about substantial disestablishment of the dual system based on race. Defendants need promptly to take adequate steps to convert the schools into a unitary, nonracial system.

B. Faculty and Staff Desegregation

8. Faculty and staff were completely segregated according to racial patterns prior to the 1966–1967 year. During 1966–1967, defendants employed 160 Negro teachers and assigned 159 of these teachers to Negro schools and one to a predominantly white school. The Board employed 97 white teachers, all of whom defendants assigned to predominantly white schools. Defendants employed 73 new teachers in 1966–1967, of whom 36 were Negro and 37 were white.

9. By January 25, 1968, of the 1967–1968 school year, the Board had assigned 79 full-time white teachers and a total of eight Negro teachers to predominantly white schools. Of the eight Negro teachers across racial lines, one teaches bricklaying and another teaches carpentry.

The Board assigned 149 full-time Negro teachers and eight white teachers to Negro schools. Of the eight, one teaches art and one teaches kindergarten. Four schools had faculties all of one race. There were a total of 40 new teachers in the defendants' system in 1967–1968, of whom 24 were Negro and 16 were white.

10. Defendants' plans for the 1968–1969 year call for assigning 9 Negro teachers scattered at four predominantly white schools and 16 white teachers among eight Negro schools. Defendants propose that the remaining 149 Negro and 87 white teachers will be assigned to schools where their race is in the majority. One all-white school, Askewville Elementary, with an all-white student body, and one predominantly white school, West Bertie Elementary, will, under defendants' plans, remain with all-white faculties.

11. Five of defendants' teachers, one white and four Negro, testified they were presently assigned to schools where their race was in the majority, but they all indicated willingness to accept assignment to a school where their race would be in the minority, although some indicated they would do so reluctantly. Two of these teachers, Mrs. Pierce and Mrs. Law, had previously discussed teaching in an integrated school with school authorities, but were never assigned to an integrated school. One white teachers' aide also testified she had graduated from predominantly white Bertie High in 1967, was employed and assigned to all-Negro Southwestern High in 1967–1968, and would prefer to return there rather than be reassigned to another school.

12. The principals at each of the schools are of the same race as the majority of students of each school. For 1968–1969 defendants propose that one white principal serve as principal at both the predominantly white Colerain Elementary School and also at nearby West Colerain Elementary School, a Negro school.

13. During 1966–1967, defendants assigned all of their 54 teachers' aides, all of whom were Negroes, to schools of the same race. In 1967–1968, defendants employed 28 Negro teachers' aides and 28 white teachers' aides, and assigned 19 white teachers' aides to seven Negro schools, and 3 Negro teachers' aides to two predominantly white schools.

14. Faculties and staffs of the several schools in Bertie County remain almost entirely segregated, with the effect that each school in the county is clearly racially identifiable by the composition of its faculty. The defendants have not taken adequate affirmative steps to accomplish substantial desegregation of faculties and staffs within its system.

15. Each of the 15 secretaries and clerical workers employed by defendants during both 1966–1967 and 1967–1968, were assigned to schools that are historically maintained for their race. All 99 bus drivers employed during 1967–1968, reflected the racial majorities at the schools where they were employed.

16. Membership of the school advisory councils at each of the predominantly white schools was composed entirely of white persons, and at each of the Negro schools of Negro persons.

17. Bus transportation remains essentially segregated. Although many predominantly white schools and Negro schools are located side-by-side in several communities, and the residences of white and Negro persons are scattered throughout Bertie County, separate buses pick up children at the predominantly white and the Negro schools. In serving the schools of the different races, the buses travel overlapping and duplicative routes, resulting not only in maintenance of separate transportation based on race, but also in higher operating expense.

18. The defendants' athletic program remains effectively segregated. While Negro students attending predominantly white schools may participate in athletics at those schools, the predominantly white schools schedule contests only with other predominantly white schools and the Negro schools play only other Negro schools.

C. School Facilities

19. Schools previously maintained as white schools are substantially superior to the all-Negro schools. Statistics taken from defendants' records disclose the following information for the year 1967–68:

| Valuation of School Property Per Pupil | Predominantly White Schools | Negro Schools |
|---|---|---|
| Total Valuation [1] | $1,953,178.82 | $2,053,793.67 |
| Number of pupils | 2388 | 4339 |
| Valuation per pupil | 817.91 | 473.33 |

Two of the Negro schools—W. S. Etheridge Elementary and C. G. White Union—have sub-standard physical plants, with classrooms which are heated with pot-bellied stoves. Several of the Negro elementary schools are substantially inferior to predominantly white schools in the same communities in terms of over-

[1]. These figures are for 1966–1967, the latest year for which figures for these items were available. The number of students for the predominantly white and Negro schools was in all instances for 1967–1968.

crowding. The C. G. White High School, which is all-Negro, offers an educational program which is markedly inferior to that at Bertie High School. According to the Superintendent of Education, assignment of Negro teachers to predominantly white schools would lower the educational opportunities at such schools. This testimony reflects a recognition of the general inferiority of the Negro schools in Bertie County.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter of the action.

■ 2. In 1954 the United States Supreme Court held in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*) that "segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprives the children in the minority group of equal educational opportunities." See Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II). Notwithstanding the fact that the burden rests upon school authorities "to effectuate the transition to a racially nondiscriminatory school system," *Brown II*, and that school boards were directed "to make a prompt and reasonable start toward dismantling the dual system," *Brown II*, the defendants' first efforts toward compliance came in 1965. Under these circumstances, further delays are no longer tolerable, Green v. County School Board of New Kent County, Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (decided May 27, 1968).

■■ 3. While "freedom of choice" is not, *per se*, an unconstitutional method of pupil assignment it may be utilized only if it promises meaningful and immediate progress towards disestablishing state-imposed segregation and promptly converting a school system into one without "white" schools or "Negro" schools but just schools. Green v. County School Board of New Kent County, Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. If there are reasonably available other ways, such for illustration as zoning or grade consolidation, promising speedier and more effective conversion to a unitary, nonracial school system, "freedom of choice" must be held unacceptable (Green, supra, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716). Where, as here, the progress made by the School Board under "freedom of choice" towards the disestablishment of the dual system has been significantly less than the amount of desegregation disapproved by the Supreme Court in New Kent County, continued adherence to "freedom of choice" is constitutionally impermissible.

■ 4. In Monroe v. Board of Commissioners of City of Jackson, Tenn., 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (May 27, 1968), white students originally assigned to the only school in the attendance area of their residence, but which only Negro students attended, were allowed a transfer to predominantly white schools in another attendance area under a "free transfer" plan. The Supreme Court specifically disapproved this "free transfer" provision for an attendance area where, as in Bertie County, the schools have a majority of Negro students. "We are frankly told in the Brief that without the transfer option its (sic) is apprehended that white students will flee the school system altogether. 'But it should go without saying that the validity of these constitutional principles cannot be allowed to yield simply because of disagreement with them.' Brown II, 349 U.S. 294, at 300, 75 S.Ct. at 756." *Monroe*, supra, 391 U.S. at p. 459, 88 S.Ct. at p. 1705, 20 L.Ed.2d at p. 739.

The Supreme Court similarly set aside "freedom of choice" plans in two other districts in which Negro students were in the majority, *Green*, supra; Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (May 27, 1968). In *Raney*, the ratio of Negroes to whites in the school system was approximately 2:1. It is axiomatic that the constitutional

rights of Negro children may not be restricted because of opposition to their implementation, *Brown II*, supra, 349 U.S. at 300, 75 S.Ct. 753; Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5 (1958), and see Coppedge v. Franklin County Board of Education, 273 F. Supp. 289 (E.D.N.C.1967), aff'd 394 F. 2d 410 (4th Cir. 1968). Accordingly, conversion to a unitary system may neither be avoided nor postponed on the basis of community attitudes, actual or supposed. See also remarks of Judge Merhige in the argument in *Green* on remand, week of July 15, 1968.

■ 5. "The burden on the school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*." *Green*, supra, 391 U.S. at p. 439, 88 S.Ct. at p. 1694, 20 L.Ed.2d at p. 724 (emphasis the Court's); see also Watson v. City of Memphis, 373 U.S. 526, 529, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963); Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Unless the school board can demonstrate the existence of nonracial administrative obstacles, unrelated to community attitudes, which make immediate conversion to a unitary system practically unfeasible, the command of the *Green* case must be implemented immediately. *Brown II*, supra, 349 U.S. at 300, 75 S.Ct. 753; *Green*, supra, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. In the present case, the testimony of the Superintendent of Education as to administrative difficulties consisted of the following:

Q. Do you know of any reasons why the elementary schools that are located in the various communities, I am referring now to West Colerain, Colerain and in Aulander, the two schools there, and the other towns and communities where there is more than one school; do you know the reasons why

those elementary schools couldn't be consolidated by grades?

A. About the only reason being under the freedom of choice, they selected to go to a specific school. That's the school that they as individuals wanted to go to and so that's what they chose and we respected their choice.[2]

Defendants have fallen far short of meeting the burden of showing that the prompt implementation of constitutional rights which have been denied for so long cannot be accomplished in substantial part for 1968–1969, and completed for 1969–70.

■ 6. Where "freedom of choice" plans have been held invalid, school boards have ordinarily been afforded an option between geographic zoning, school or grade consolidation, or some combination of these plans. *Green*, supra, note 6; *Coppedge*, supra, 273 F.Supp. at 300; see also Corbin and United States v. County School Board of Loudoun County, Virginia, 283 F.Supp. 60, 63 (E.D.Va. 1967); Singleton and United States v. Anson County Board of Education, 283 F.Supp. 895 (W.D.N.C.1968). In electing between such alternative plans, the defendants should bear in mind that the reorganization of grade structures to accomplish grade consolidation of previously white and Negro schools in the same geographical area will automatically desegregate faculties and facilities as well as pupils.

■ 7. If the defendants elect to desegregate pursuant to geographical attendance zones, it is their obligation to draw those zones in such a manner as to eliminate the effects of past racial discrimination and to achieve desegregation. Davis v. Board of School Commissioners of Mobile County, Alabama, 393 F.2d 690, 696, 698 (5th Cir. 1968); Stell v. Board of Public Education for City of Savannah and Chatham County, 387 F.2d

---

2. Dupree, dep., pp. 130–131. See also the testimony, to the same effect by plaintiff's expert witness, Dr. Jack Larson, at pp. 16–17 of his deposition.

486 (5th Cir. 1967). Where racial residential patterns are the result of private discrimination, attendance zones may not lawfully be superimposed on the resultant segregation, and the School Board has the constitutional obligation to draw zones in such a way as to counteract the effects of such discrimination. Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37 (4th Cir. May 31, 1968).

■ 8. The defendants have not made adequate progress in faculty desegregation. "Removal of race considerations from faculty selection and allocation is, as a matter of law, an inseparable and indispensable command within the abolition of pupil segregation in public schools as pronounced in [Brown I]." Wheeler v. Durham City Board of Education, 363 F.2d 738 (4th Cir. 1966); see Rogers v. Paul, 382 U.S. 198, 86 S. Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board, etc., 382 U.S. 103, 86 S. Ct. 224, 15 L.Ed.2d 187 (1965). "The pattern of faculty assignment should be designed to avoid identification of any particular school as predominantly Negro or white," Brewer v. School Board of City of Norfolk, supra, and, to that end, it has been held that the ratio of white to nonwhite teachers at each school in the district should reasonably approximate the ratio of white to nonwhite teachers in the system as a whole. Coppedge v. Franklin County Board of Education, 273 F.Supp. 289 (E.D.N.C. 1967), aff'd, 394 F.2d 410 (4th Cir. 1968); see Dowell v. School Board of Oklahoma City Public Schools, 244 F. Supp. 971 (W.D.Okl.1965), aff'd 375 F. 2d 158 (10th Cir. 1967), cert. den. 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967); Kier v. County School Board of Augusta County, Va., 249 F.Supp. 239, 249 (W.D.Va.1966). The failure of the defendants to accomplish any significant degree of faculty desegregation even though nearly 113 new teachers have been hired in the system during the past two years requires this Court to award more comprehensive relief than would otherwise be necessary, and further necessitates that the defendants adopt the kind of general desegregation plan which will promptly desegregate their faculties. See Coppedge, supra.

9. With respect to faculty desegregation, "the fulfillment of the Constitution cannot rest on the willingness of people to abide. The School Boards do not meet their duty by soliciting volunteers. * * There is an affirmative duty on the part of the School Boards to do everything—the word is everything—within their power to meet the decree—imposed complete desegregation of faculties. It is not, it cannot be, left to the voluntariness of teacher applicants or transfers. * * * The [School Board] has to make its assignment orders effective which could mean, of course, the sanction of discharge of * * * an unwilling teacher, no matter how conscientious were the personal feelings against transfer." United States v. Board of Education of City of Bessemer, Alabama, 396 F.2d 44 (5th Cir. June 3, 1968), see also Coppedge, supra, 273 F. Supp. at 296–297; Brewer, supra.

10. The present transportation system is not only segregated but also costly and inefficient. As the Court said in Kelley v. Altheimer, Arkansas School District No. 22, 378 F.2d 483, 497 (8th Cir. 1967)

The Board of Education transports rural students to and from their homes precisely as it did during the many years it operated a segregated school system. It was inefficient and costly then. It is just as inefficient and costly now. Running two school buses down the same country road, one to pick up and deliver Martin students and the other to pick up and deliver next door neighbors attending Altheimer, is a luxury that this impoverished school could not afford in the past and cannot afford now. The difference is that, before Brown, the Board had the same right to operate segregated schools. While we have no authority to strike down transportation systems because they are costly and inefficient, we must strike them

down if their operation serves to discourage the desegregation of the school system."

See also Corbin and United States v. County School Board of Loudoun County, Virginia, 283 F.Supp. 60, 63, (E.D.Va.1967); Singleton and United States v. Anson County Board of Education, 283 F.Supp. 895, 902 (W.D.N.C. 1968). Accordingly, prompt conversion to a unitary system will not only desegregate the schools but also add considerable efficiency to the transportation system.

■ 11. The defendants have the constitutional obligation to correct the educational disparities in school facilities between schools heretofore maintained for Negro students and schools previously maintained for white students, and to afford all students of all races in all schools equal educational opportunities. *Coppedge,* supra, 273 F.Supp. at 299 and authorities there cited.

■ 12. The absence of regularly scheduled athletic contests between teams from Negro schools and teams from white schools, is attributable to a distinction based on race in the operation of school activities. "Such a distinction based on race is no longer tolerable; the integration of activities must be complete." Davis v. Board of School Commissioners of Mobile County, Ala., 393 F.2d 690, 696 (5th Cir. 1968); United States v. Jefferson County Board of Education, 372 F.2d 836, 846, fn. 5.

Upon these findings of fact and conclusions of law, the Court enters the following order, to wit:

## ORDER

Upon the foregoing findings of fact and conclusions of law, it is ordered, adjudged and decreed that:

1. The defendant Board of Education shall assign all students attending Bertie County schools in grades 10, 11 and 12 to Bertie High School, effective with the opening of the 1968–69 school year. All students in grade 9 in the Bertie County schools shall be assigned to Southwestern School. So many of the students in the 8th grade in the various schools of the County as may be practicably accommodated at Southwestern School shall be assigned to said facility, commencing with the opening of the 1968–69 school year. Upon completion of the construction of 8 additional classrooms and related facilities being constructed at Southwestern School and the relocation of mobile classrooms in the vicinity of said facility, all of the remaining 8th grade students not previously assigned to Southwestern School shall be reassigned to that facility, together with such teachers and other personnel as may be necessary or appropriate.

2. On or before January 1, 1969, the defendant Board shall prepare and file with this Court, and serve copy on opposing counsel, a plan of school desegregation providing for the complete elimination of the dual school system in Bertie County schools with respect to pupil and faculty assignments, facilities, transportation, and other school activities, which plan is to be effective with the commencement of the 1969–70 school year. With respect to pupil assignments, the plan shall prescribe unitary, non-racial, geographic attendance zones or consolidation of grades or schools or some combination of the foregoing, and pupil assignments shall not depend upon a choice to be exercised by or on behalf of such pupils.

3. Principals, teachers and other professional staff members shall not be discriminatorily assigned, dismissed, demoted or passed over for retention, promotion or rehiring on the ground of race or color. In any instance where one or more principals, teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy shall be filled through recruitment from outside of the system unless no such displaced staff member is qualified to fill the vacancy. If as a result of desegregation there is to be a reduction in the total professional staff

of the school system, the qualifications of all the staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color.

4. The Court having considered the motion of the individual defendants to dismiss this action as to them in their individual capacities and the Court being of the opinion that said motion should be allowed, this action is hereby dismissed as to the individual defendants in their individual capacities.

5. This Court having considered the motion of the corporate defendant, the Bertie County Board of Education, to dismiss the complaint for failure to state a claim upon which relief can be granted, motion for a judgment on the pleadings, motion for summary judgment and for trial by jury, and the Court being of the opinion that Section 407(a) and (b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6(a) and (b) are a constitutionally valid exercise of the congressional power and that the plaintiff has complied with the requirements of said Act; that the complaint states a claim upon which relief can be granted; that there is insufficient basis for summary judgment in favor of the defendant; and further, that the defendant is not entitled to trial by jury, said motions are therefore denied.

6. With respect to all school programs, activities and functions, the Board shall take such steps as may be necessary that such programs, activities and functions be conducted and carried out without regard to race or color.

7. The plaintiff's motion for preliminary injunction heretofore made was granted orally, and the defendant has complied with said oral injunction insofar as it was able to do so.

8. The Court shall retain jurisdiction of this cause.

9. The Clerk shall serve a copy of the foregoing and attached findings of fact, conclusions of law and order upon all counsel of record.